IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STACIE BLAKESLEE, | : | No. 07-CV-1364 |
| | : | |
| Plaintiff, | : | Judge John E. Jones III |
| | : | |
| v. | : | |
| | : | |
| CLINTON COUNTY, *et al.* | : | |
| Defendants | : | |

## MEMORANDUM

September 22, 2008

This action arises out of the suicide of Robert Young committed while incarcerated at the Clinton County Correctional Facility ("CCCF"). Plaintiff Stacie Blakeslee commenced this action as the administratrix of Young's estate, on her own behalf as Young's widow, and on behalf of Young's daughter. This matter is before the Court on the defendants' motion for summary judgment. (Doc. 21.) For the reasons set forth below, the motion will be granted and judgment entered in favor of the defendants.

## I. STANDARD OF REVIEW

Summary judgment is appropriate if the record establishes "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Initially, the moving party bears the

1

burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant meets this burden by pointing to an absence of evidence supporting an essential element as to which the non-moving party will bear the burden of proof at trial. *Id.* at 325. Once the moving party meets its burden, the burden then shifts to the non-moving party to show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e)(2). An issue is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a factual dispute is "material" only if it might affect the outcome of the action under the governing law. *Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 248-49 (1986).

In opposing summary judgment, the non-moving party "may not rely merely on allegations of denials in its own pleadings; rather, its response must ... set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985).

However, the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the non- moving party. *P.N. v. Clementon Bd. of Educ.*, 442 F.3d 848, 852 (3d Cir. 2006).

Summary judgment should not be granted when there is a disagreement about the facts or the proper inferences that a factfinder could draw from them. *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982). Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; there must be a *genuine* issue of *material* fact to preclude summary judgment." *Anderson*, 477 U.S. at 247-48.

## II.   BACKGROUND

With this standard of review in mind, the following are the undisputed facts material to the present motion, drawing any reasonable inferences in favor of the non-moving party, the plaintiffs.[1]

---

[1] The plaintiffs filed a response to the defendants' motion for summary judgment (Doc. 26), which includes limited summaries of the numerous depositions taken in this case (*id.* at 3-17). However, the plaintiffs failed to respond to the defendants' statement of undisputed material facts (Doc. 22) as required by Local Rule 56.1. The Court will therefore deem all material facts in the defendants' statement admitted so long as the defendants have cited to record evidence supporting the asserted fact. *See Anchorage Assocs. v. Virgin Islands Bd. of Tax Review*, 922 F.2d 168, 175-76 (3d Cir. 1990).

The Court also notes that the entirety of the plaintiffs' opposition to the defendants' motion merely entreats the Court to examine the record, without so much as a single citation. (*See* Doc. 25.) This submission is woefully inadequate. "Judges are not like pigs, hunting for

On July 11, 2005, Young was transferred from the Mercer County Jail to CCCF.  (Pl.'s Resp. to Defs.' Mot. for Summ. J., Doc. 26, at 4.)  Young had been making suicidal statements and therefore was placed on suicide alert status, under which officers checked on Young every fifteen minutes and recorded his activities. (Defs.' Statement of Material Facts ["SMF"] ¶¶ 51-52, 67.)  Deputy Warden Jacqueline Motter also referred Young to Laura Dengler who works for the Mental Health/Mental Retardation Program of Lycoming and Clinton Counties ("MH/MR"), the agency which provides mental health services to inmates at CCCF.  (*Id.* at ¶¶ 6,  51, 65, 66.)  Dengler is the mental health liaison at CCCF and screens inmates for mental health services.  (*Id.* at ¶ 66.)

After meeting with Young, Dengler found that while he was situationally frustrated and depressed and his mood was angry, these conditions were appropriate for his situation, and that Young was oriented to time, place, and person; was not psychotic; had good eye contact; and assured his own safety. (Dengler Dep., Doc. 21-8, at 9.)  Dengler determined Young was no longer a danger to himself and recommended removal from suicide watch.  (*Id.* at ¶ 67.)

---

truffles buried in the record."  *Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820 (3d Cir. 2006).  It is the non-moving party's obligation in opposing summary judgment to "set out *specific facts* showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2) (emphasis added).  The plaintiffs have not done so, and therefore, the Court has reviewed the defendants' submissions to determine whether summary judgment is appropriate.  *See Lorenzo v. Griffith*, 12 F.3d 23, 28 (3d Cir. 1993); *Anchorage Assocs.*, 922 F.2d at 174-75.

On the evening of July 25, 2005, while Corrections Officer Angela Watson was making her rounds, Young stated that he thought his medication was inappropriate. (Watson Dep., Doc. 21-4, at 10.) Officer Watson told Young to speak with the nurse when she made her regular rounds to dispense medication for the night. (*Id.*) Unwilling to wait, Young stopped Officer Watson on her next round and stated that he felt his medication was making him worse, that he thought it was going to make him feel like hurting himself, and that he wanted to speak to someone from the medical department. (*Id.*) Young also showed Officer Watson what looked like a brush burn on his wrist, but when questioned about it, stated it was an accident. (*Id.*) In response, Officer Watson informed her supervisor Lieutenant Colon, a suicide alert was issued, and a nurse was sent to speak with Young. (*Id.* at 11; SMF ¶ 9.) It was determined that Young did not intend to harm himself but had told Officer Watson that to cause someone from the medical department to speak with him sooner. (Watson Dep. at 11.) Lieutenant Colon directed Officer Watson to keep watch on Young and notified MH/MR of the incident. (Extraordinary Occurrence Report, Doc. 21-16, at 1.)

The next morning, July 26, 2005, Young was placed on suicide alert status with fifteen-minute checks. (SMF ¶ 10.) His property was removed from his cell,

he was placed in a suicide gown[2], and MH/MR was called to assess him.  (*Id.*; Extraordinary Occurrence Report, Doc. 21-16 at 3;)  On July 27, 2005, Young was taken off suicide watch by a mental health counselor.  (Rozazza Rep., Doc. 21-13, at 2.)

On August 10, 2005, Young attempted suicide by slitting his wrists with a razor blade.  (SMF ¶ 11.)  Inmates not on suicide watch are generally permitted use of a razor for a limited time upon request.  (*Id.* at ¶ 13.)  Young had previously been provided with a razor upon request and returned it without incident.  (*Id.* at ¶ 12.)  During a security round, Correctional Officer Michael Marino discovered Young kneeling over his toilet bleeding and sounded the code for a medical emergency.  (Marino Dep., Doc. 21-6, at 11.)  Officers and medical personnel responded immediately and provided treatment until Young was transported to Lock Haven Hospital.  (*Id.* at 11-13; Polen Dep, Doc. 21-5, at 7, 12-14; Miller Dep., Doc. 24-2, at 6-8; SMF ¶ 14.)  On his way to and during his time at the hospital, Young indicated that he would try to harm himself again.  (Polen Dep. at 17-19; Dingler Dep. at 11; Rozazza Rep. at 2.)  Throughout his stay at the hospital, Young was guarded by correctional officers who attempted to comfort him.  (Polen

---

[2] The suicide gown at CCCF is a green single-piece outer garment made of heavy nylon, fastened by velcro, and worn over an inmate's undergarments, the intent of which is to prevent the inmate from using his clothing to inflict self-harm.  (*See* Marino Dep. at 5-6, 21-22; Lapriloa Dep, Doc. 21-9, at 15-16; Pennsylvania State Police Report ["PSP Rep."], Doc. 21-15.)

Dep. at 17-19, 41-44; Miller Dep. at 8-12.)  Involuntary commitment of Young

was considered, but none of the doctors that examined him or the MH/MR

representative recommended such action, and it was eventually determined that

Young would be returned to CCCF.  (SMF ¶¶ 15, 35; Dingler Dep. at 13-14.)

Young was returned to CCCF in the early afternoon of August 12, 2005.

(Tressler Dep. at 32; Extraordinary Incident Report, Doc. 21-16.)  Young was

strip-searched, placed in a suicide gown, and taken to the restricted housing unit

where he would be confined to his cell 23 hours per day.  (Extraordinary Incident

Report, Doc. 21-16; Motter Dep., Doc. 21-12, at 8-9.)  Young indicated to

correctional officers that he did not intend to harm himself.  (SMF ¶ 19;

Extraordinary Incident Report, Doc. 21-16.)  Nevertheless, because Young had

been attempting to remove the stitches in his wrists while in the hospital, doctors

ordered Young's arms restrained, and therefore, Young was therefore placed in a

restraint chair which prevented him from moving.  (SMF ¶ 18; Extraordinary

Incident Report, Doc. 21-16; Rozazza Rep. at 2.)  Young was also placed on

suicide watch with fifteen-minute checks.  (SMF ¶ 19; Extraordinary Incident

Report, Doc. 21-16.)

At the request of Lieutenant Keen, Dingler, the MH/MR representative, came to CCCF to evaluate Young.  (Dingler Dep. at 22.)  Dingler observed that Young's eye contact was excellent, his speech was normal, and that his conversation was goal-oriented, indicating that he did not appear to be clinically depressed.  (*Id.* at 20-21.)  However, Young stated that he still intended to harm himself, and therefore Dingler ordered the suicide watch to be continued over the weekend and indicated she would reassess Young on Monday, August 15, 2005. (*Id.* at 11, 12-13, 21.)

Young remained in the restraint chair throughout August 12, 2005 and into the morning of August 13, 2005, except when briefly allowed out to eat, stretch, or use the restroom.  (Rozazza Rep. at 2; PSP Rep. at 2.)  During the night, Lieutenant Barbara Ream draped a blanket over Young while he was in the restraint chair because he indicated he was cold.  (Duran Dep. at 17.)  Lieutenant Donald Tressler began his rounds on the morning of August 13, 2005 and spoke with Young while he was in the restraint chair.  (SMF ¶ 21.)  Young stated that he was "goddamn near froze" and requested that he be placed in his cell where he could lie down and warm up.  (*Id.*; Tressler Dep. at 13, 33.)  Young promised that if he was allowed to lay down in his cell, he would not touch his bandages or attempt to harm himself, and Tressler perceived that Young did not seem like he wanted to hurt himself.

(SMF ¶¶ 21, 22, 24; Tressler Dep. at 34.)  At approximately 7:15 a.m., Young was released from the restraint chair and placed in a cell in L-Block.  (Tressler Dep. at 14; Rozazza Rep. at 2.)  Lieutenant Tressler permitted Young to keep the blanket that had previously been draped over him.  (SMF ¶ 23.)  Cell numbers one and two in L-Block are single-inmate cells with single beds approved for suicidal inmates. (*Id.* at ¶ 27.)  Young was not placed in these cells, however, because they were occupied by other inmates and instead was placed in cell number 8, a two-inmate cell with a bunk bed.  (*Id.* at ¶ 28.)

Young was continued on suicide watch, and correctional officers continued to monitor and record his activities every fifteen minutes.  (Tressler Dep. at 39; Chronological History, Doc. 21-16; Rozazza Rep. at 2; PSP Rep. at 2.)  Lieutenant Tressler also checked on Young three more times during his shift.  (Tressler Dep. at 14, 34-35.)  During his last check at 2:15 p.m., Young thanked Tressler for putting him in the cell, stated that he was finally getting warm, and showed Tressler his bandages to prove he had not attempted to remove them.  (SMF ¶ 22; Tressler Dep. at 35.)

Correctional Officer Lori Probst took her post and began rounds in L-Block at 3:00 p.m.  (Lapriloa Dep. at 7.)  Officer Probst performed checks on Young at 3:00, 3:15, and 3:30 p.m., and found him walking around the cell or standing at the

cell door.  (*Id.* at 8; Chronological History, Doc. 21-16; PSP Rep. at 2.)  At 3:45 p.m., Officer Probst found Young hanging from the ladder of the bunk bed in his cell.  (Lapriloa Dep. at 7-8; Rozazza Rep. at 2; PSP Rep. at 2.)  Young had tied one end of the blanket to the top rung of the ladder and tied the other end in a knot around his neck.  (Rozazza Rep. at 2; PSP Rep. at 2.)  Officer Probst sounded the code for a medical emergency.  (Lapriloa Dep. at 9-10.)  Other officers arrived, the knot was untied, Young was lowered to the floor, and emergency treatment was performed until EMS personnel arrived.  (*Id.* at 15; 16; Tressler Dep. at 15-16; PSP Rep. at 2-3.)  Young was transported to Lock Haven Hospital and placed on a ventilator, and was subsequently transferred to Williamsport Hospital and placed in the intensive care unit.  (Rozazza Rep. at 2; PSP Rep. at 3.)  On August 14, 2005, life support was discontinued and Young was pronounced dead.  (*Id.*)  Young's is the only successful suicide at CCCF from the time Warden Thomas Duran became warden in 1993 to the present.  (SMF ¶¶ 72-73.)

At the time of these incidents, CCCF had in place policies regarding identification and management of suicidal inmates and the treatment of attempted suicides.  (*See* Duran Dep. at Ex. 2-5.)  These policies were drafted and adopted by Warden Duran in 1993.  (SMF ¶ 37-38.)  The CCCF policies are based on the standards of the American Correctional Association and Federal Bureau of Prison

policies and adapted to the specific requirements of CCCF.  (*Id.* at ¶¶ 39-41.)  The

policies are reviewed annually, as well as anytime there is an incident at the

facility, and have been revised twice.  (*Id.* at ¶¶ 43, 44, 47, 50.)

Policy Number 300-23, Identification, Classification, and Management of

Suicidal and Self-Destructive Inmates, provides that inmates who appear to be

potentially suicidal are to be referred to mental health staff.  Classification of the

inmate as suicidal, treatment and housing of the inmate, and possible commitment

are determined based on the assessment of mental health staff.  (*Id.* at ¶ 51; Duran

Dep. at Ex. 5.)  An inmate identified as suicidal is to be housed in L-Block cells 1

or 2 or other designated cells and placed on an automatic fifteen-minute watch,

during which officers must record their observations of the inmate's behavior.

(*Id.*)  Policy 300-23 also provides:

> All property from which the inmate could potentially harm oneself is to
> be removed from the cell.  This includes, but is not limited to:  shoe
> laces, sheets, strings, earphones, combs, hair brush, toothbrush, any other
> sharp items, etc.  The removal of other objects or clothing is to be
> assessed on an individual basis.

(*Id.*)  If an inmate continues to attempt to harm himself, the policy provides for the

use of restraints.  (*Id.*)  The policy also provides that throughout the management

of a suicidal inmate, staff are to "ensure that inmates are reasonably consuming

food and maintaining personal hygiene."  (Duran Dep. at Ex. 5.)

Policy Number 300-13 establishes the procedures to be following in the event of an attempted inmate suicide.  (SMF ¶ 48; Duran Dep. at Ex. 4.)  Upon discovery of the emergency, the alarm is to be sounded, security established at the scene, and notification given to appropriate emergency responders, the county sheriff, the shift commander, duty officer, and warden.  (*Id.*)  First aid is performed and a nurse or doctor summoned.  (*Id.*)  In the case of a strangulation, inmates in the area are to elevate the hanging inmate to remove pressure from the throat, untie the noose, and place the victim on the floor pending the entrance of correctional officers into the secured area.  (*Id.*)  In the case of a cutting of the wrists or other body part, staff are to administer first aid to control bleeding.  (*Id.*)  First aid is to begin immediately, and if the inmate must be taken to a hospital, staff are to remain with the inmate to continue first aid until the rescue squad arrives and to assist in transportation as necessary.  (*Id.*)  All actions relating to the suicide attempt are documented, and the next of kin is notified by the shift commander if an inmate is admitted to the hospital with a life-threatening condition.  (*Id.*)

Policy 300-13 also establishes the procedures for the detection of suicidal risks and prevent of attempted suicides.  (SMF ¶ 49, Duran Dep. at Ex. 4.)  Officers are to routinely and closely observe inmates who are newly committed, receiving lengthy or unexpected sentences, quarreling with family members,

receiving adverse news, or suffering from withdrawal because these inmates are at greater risk. (*Id.*) Inmates are to be searched for contraband which may be used to attempt suicide, and inmates who are intoxicated or who are displaying obvious suicidal tendencies at the time of commitment are to have articles of attire with which they could harm themselves removed. (*Id.*) Officers assigned to the area where a suicide risk is housed are to make more frequent security patrols, occurring every fifteen minutes and document this activity in their daily log. Identification of an inmate as a suicide risk is to be documented on three different reports, and the inmate is to be scheduled for an examination with a nurse or physician and mental health staff at the earliest opportunity. (*Id.*) The status of inmates deemed to be suicide risks is to be reviewed weekly by the deputy warden and mental health officials. (*Id.*)

At orientation, CCCF officers are provided with these policies as part of a policies and procedures manual, and must watch a video on suicide prevention. (SMF ¶¶ 45, 57.) All CCCF correctional officers also must complete the Pennsylvania Department of Corrections five-week training academy. (*Id.* at ¶ 56.) CCCF also conducts fifteen minutes of training for correctional officers prior to every shift, during which officers receive training on various topics, including suicide prevention and CCCF policies. (*Id.* at ¶¶ 58-60.) CCCF also conducts an

annual refresher training course for all correctional officers which includes training on suicide prevention.  (*Id.* at ¶¶ 61-62.)  Correctional officers also receive training on mental health topics through MH/MR.  (*Id.* at ¶ 63.)

## III.   DISCUSSION

### A.   John Doe Defendants

Before turning to the merits of the plaintiffs' claims, the Court must address the putative defendants sued under the fictitious names John Does 1-5.  Fictitious names may be used until reasonable discovery permits the actual defendants to assume their places, but John and Jane Doe defendants must eventually be dismissed if discovery yields no identities.  *See Parker v. United States*, 197 Fed. Appx. 171, 173 n.1 (3d Cir. 2006); *Aponte v. Karnes*, 2008 WL 360879, at *1 n.1 (M.D. Pa. Feb. 8, 2008); *Smith v. Lucas*, 2007 WL 1575231, at *8 (M.D. Pa. May 31, 2007).

The discovery deadline in this case was July 15, 2008, and the plaintiffs, by their own admission, conducted extensive discovery including a "wide range of depositions from all positions of the officers, employees, and related personnel." (*See* Doc. 25 at 3.)  The plaintiffs, however, have not amended their complaint or otherwise attempted to identify the John Doe defendants.  Therefore, the Court will dismiss the five John Doe defendants without prejudice pursuant to Fed. R. Civ. P.

21.  *See K.K. ex rel Knowles v. Weeks*, 2007 WL 1455888, at *5 (M.D. Pa. May 15, 2007).

### B.  Municipal Liability

The plaintiffs seek to hold Clinton County liable on the theory that CCCF's policies and training regarding the identification and prevention of possible suicides are inadequate.  A municipality may be held liable under § 1983 only if a plaintiff demonstrates that the municipality itself, through the implementation of a municipal policy or custom, causes or is the "moving force"  behind a constitutional violation.  *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1027 (3d Cir. 1991) (citing *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 691-95 (1978) and *Polk County v. Dodson*, 454 U.S. 312 (1981)). Liability cannot be predicated on a theory of respondeat superior or vicarious liability.  *Id.* (citing *Monell*, 436 U.S. at 693-94).

As an initial matter, to the extent the plaintiffs' claims are based on the alleged inadequacy of CCCF's policies themselves, these claims must fail.  The plaintiffs submit the report of Alvin Cohn, an expert in criminal justice administration, which suggests at least one procedure CCCF should have followed to prevent Young's suicide.  (Cohn Rep., Doc. 25-2, at 4 [stating that "Young should have been placed on one-on-one observation until he could be transferred to

a mental health facility for a full psychiatric evaluation"].)  However, CCCF's

policies regarding the identification and management of suicidal inmates and the

prevention of suicide conform to industry standards (Rosazza Rep. at 3), and there

can be little doubt that on their face these policies are constitutional.  *See City of*

*Canton v. Harris*, 489 U.S. 378, 386-87 (1989); *Colburn*, 946 F.2d at 1027-28.  As

the plaintiffs themselves concede, their claim is not that CCCF's policies were

inadequate, but that these concededly valid policies were unconstitutionally applied

(*see* Doc. 25 at 4) and that Clinton County is liable for this constitutional wrong

because its employees were not adequately trained.  *See City of Canton*, 489 U.S.

at 387; *Colburn*, 946 F.2d at 1027-28.

Municipal liability may be predicated upon a failure to train.  *Woloszyn v.*

*County of Lawrence*, 396 F.3d 314, 324 (3d Cir. 2005) (citing *City of Canton*, 489

U.S. at 387).  "However, a municipality is only liable for failing to train when that

failure amounts to deliberate indifference to the constitutional rights of persons

with whom the police come in contact."  *Id.* (quoting *Colburn*, 946 F.2d at 1028)

(internal punctuation omitted).  Not all failures or lapses in training will support

liability under § 1983:

> Only where a municipality's failure to train its employees in relevant
> respect evidences a "deliberate indifference" to the rights of its
> inhabitants can such a shortcoming be properly thought of as a city
> "policy or custom" that is actionable under § 1983.... Only where a

16

> failure to train reflects a "deliberate" or "conscious" choice by a
> municipality – a "policy" as defined by our prior cases – can a city be
> liable for such a failure under § 1983.

*Id.* at 324-25 (quoting *City of Canton*, 489 U.S. at 389).  To sustain a claim based

on a failure to train theory, "the identified deficiency in the training program must

be closely related to the ultimate constitutional injury", and the plaintiff must

"prove that the deficiency in training actually caused the constitutional violation,

*i.e.*, the police custodian's indifference to her medical needs."  *Id.* at 325 (quoting

*City of Canton*, 489 U.S. at 391 and *Colburn*, 946 F.2d at 1028) (internal

punctuation omitted).

With specific regard to claims such as those raised by the plaintiffs here, the

Third Circuit has explained:

> *City of Canton* teaches that in a prison suicide case under § 1983 the
> plaintiff must (1) identify specific training not provided that could
> reasonably be expected to prevent the suicide that occurred, and (2) must
> demonstrate that the risk reduction associated with the proposed training
> is so great and so obvious that the failure of those responsible for the
> content of the training program to provide it can reasonably be attributed
> to a deliberate indifference to whether the detainees succeed in taking
> their lives.

*Woloszyn*, 396 F.3d at 325 (quoting *Colburn*, 946 F.2d at 1029-30) (internal

punctuation omitted).

The plaintiffs have not met this burden.  Nowhere have the plaintiffs

identified specific training not provided to CCCF employees that could reasonably

17

be expected to have prevented Young's suicide.  The plaintiffs' expert report

criticizes Lieutenant Tressler's decisions to allow Young to keep the blanket and to

place Young in a cell without a cellmate.  But neither the plaintiffs' expert nor the

plaintiffs in their other submissions specify proposed training that CCCF could

have implemented which would have prevented these circumstances.  It is

undisputed that CCCF's policies addressed the housing of suicidal inmates and the

removal of their property.  It is undisputed that Lieutenant Tressler, like all CCCF

correctional officers, received extensive training regarding these policies and

suicide prevention.  CCCF's training regimen has apparently been quite effective,

as Young's is the only successful suicide attempt to occur at the facility in the past

fifteen years.  No reasonable jury could conclude that those responsible for the

content of CCCF's training program were deliberately indifferent to inmate

suicide, and therefore, summary judgment will be entered for Clinton County.

### B.   Individual Liability

The plaintiffs have also named as defendants Warden Duran and Clinton

County Commissioners Thomas Bossert, Harold Yost, and Richard Kyle.

Although they never specify, the plaintiffs presumably named these defendants on

the theory that they are the municipal policymakers responsible for establishing

and maintaining the allegedly unconstitutional policies and training.[3]  *See Woloszyn*, 396 F.3d at 326 (citing *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989).  Because the policies and training at issue are not unconstitutional, however, these defendants are also entitled to summary judgment for the same reasons as Clinton County.  *See id.*

To the extent the plaintiffs mean to assert another theory of liability against these individual defendants, *see, e.g.*, *Woloszyn*, 396 F.3d at 319-21, such a theory must fail because the plaintiffs have made no allegation that any of these defendants were personally involved in any way in Young's suicide.  *See Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) ("An individual government defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of respondeat superior.").

Finally, Warden Duran argues that he is entitled to summary judgment on the basis of qualified immunity.  Because the Court has found  no constitutional violation by Warden Duran, the qualified immunity defense is essentially moot, and the Court should not continue with such an analysis.  *See Scott v. Harris*, ---

---

[3] The parties do not address which, if any, of these defendants have final policymaking authority over the policies and training of CCCF.  *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 123-27 (1988).  Given the disposition of the present motion, however, the Court will assume for the sake of argument that these defendants are municipal policymakers.

U.S. ----, 127 S. Ct. 1769, 1774 (2007) (quoting *Saucier v. Katz*, 533 U.S. 194, 201

(2001)) ("In resolving questions of qualified immunity, courts are required to

resolve a 'threshold question:  Taken in the light most favorable to the party

asserting the injury, do the facts alleged show the officer's conduct violated a

constitutional right?  This must be the initial inquiry.'  If, and only if, the court

finds a violation of a constitutional right, 'the next, sequential step is to ask

whether the right was clearly established ... in light of the specific context of the

case.'").

## IV.   CONCLUSION

There can be no doubt that Young's tragic suicide is profoundly painful for

his family, as well as others involved (*see, e.g.*, Tressler Dep. at 38).  However, the

Constitution does not "place municipalities and their custodial officers and

employees in the position of guaranteeing that inmates will not commit suicide."

*Colburn*, 946 F.2d at 1029-30.  The record in this case does not allow the

conclusion that the defendants were deliberately indifferent to Young's

vulnerability, and therefore, the defendants' motion for summary judgment will be

granted.  An appropriate order will issue.[4]

---

[4] Also currently pending is the defendants' motion in limine (Doc. 30) to preclude the expert report and testimony of Alvin W. Cohn.  Given the disposition of the defendants' motion for summary judgment, their motion in limine will be denied as moot.